# David L. King, Plff. in Err., *v.* Commonwealth of Pennsylvania.

On an indictment for murder where the death was caused by a pistol shot which pierced the *medulla oblongata,* and where it became important to determine the effect of the shot in order to ascertain whether a pistol had been placed near the body of the deceased to suggest that the killing was

NOTE.—An expert may give his opinion as to the manner in which the injuries were inflicted. Com. v. Crossmire, 156 Pa. 304, 27 Atl. 40. Or as to the place at which the deceased stood. Com. v. Lenox, 3 Brewst. (Pa.) 249. Or the direction from which the blow came. Hopt v. Utah, 120 U. S. 430, 30 L. ed. 708, 7 Sup. Ct. Rep. 614; KING v. COM. was followed by the lower court in Com. v. Fry, 198 Pa. 379, 48 Atl. 257, opinions being given as to the position in which the deceased stood. Objections to the evidence were overruled by the court in refusing a new trial, and it was not made the basis of an assignment of error, and therefore does not appear in the reported case.

Proof of uncommunicated threats of the deceased have been held admissible since KING v. COM. as tending to show his motive and intention, and thus giving rise to an inference that in the fatal encounter he was the aggressor. Com. v. Keller, 191 Pa. 122, 43 Atl. 198.

committed in self defense, the evidence of a physician that after the *medulla oblongata* was struck by the bullet the deceased would have neither volition nor consciousness was competent.

Articles found upon the dead body, including letters from a witness who has testified, and which contained matter in contradiction of her evidence as to the relations between the deceased and herself, and which the defendant has agreed should be considered in evidence, are admissible although the defendant attempted to withdraw consent.

Evidence that the defendant stated that he had seen the deceased at a drug store, and that he was very nervous, and that he requested the witness to go there and hear if deceased was making threats against him, saying that if so he would swear his life against him, is admissible without proof that threats actually made by the deceased had been communicated to the defendant.

An instruction that if the defendant, anticipating the arrival of the deceased, prepared himself to carry out a previously formed intention to take his life, which he executed immediately upon meeting him, then the preparation of the means to accomplish this result, the entire absence of provocation at the time of inflicting the wound, the deadly nature of the weapon used and the vital part at which it was aimed, all tend to prove that the killing was wilful; that there was time to deliberate; that the shot was premeditated; that there was no legal ground of provocation, and no impetuous rage or passion; and the prisoner would be guilty of murder in the first degree—properly presented the case to the jury.

It was proper to instruct the jury that when it comes to the question whether one man shall flee or another shall die, the law decides that the former shall rather flee than that the latter shall die, and that to excuse homicide on the plea of self defense it must appear that the slayer had no other possible, or at least probable, means of escape.

(Argued October 3, 1887.  Decided October 17, 1887.)

October Term, 1887, No. 129, W. D., before Gordon, Ch. J., Paxson, Sterrett, Green, and Williams, JJ.  Error to Oyer and Terminer of Clarion County to review a conviction of murder in the first degree.  Affirmed.

The facts of the case appear from the following portions of the charge of the court below, Wilson, J.:

The indictment charges and alleges that the prisoner before you murdered James C. Davis.  This allegation the prisoner has denied in open court by his plea of not guilty to the bill of indictment found by the grand inquest; and the allegation and denial form what in legal parlance is called the issue; this issue you are to pass on and determine.

"James C. Davis and wife were at the house of Mrs. Dinsmore, in St. Petersburg; the wife left for St. Louis; some time afterwards her husband followed her there. Mrs. Dinsmore boarded Mr. Davis up to three or four days before he started away: he was absent three or four weeks. During his absence Mrs. Dinsmore addressed to him two letters, and he sent her one letter. These letters were received in evidence and read. Davis returned to St. Petersburg on Thursday, February 3; and on that day and the two days following he called at the Dinsmore house. On Friday he came there at 10 o'clock in the morning, took dinner with Mr. King, Mrs. Dinsmore and her daughter Lilly.

"The commonwealth to maintain the issue introduced evidence tending to establish the following facts: That between 2 and 3 o'clock in the afternoon of Saturday, February 5, the prisoner shot and killed James C. Davis, in the borough of St. Petersburg, at the house of Ella Dinsmore, in the dining room. Immediately after the act was committed Mr. King left the house and proceeded toward the office of the burgess, and within the hearing of several persons publicly stated that he had shot Davis; and when interrogated as to why he had done so, replied that he had to do it and it was in self defense. To others he stated that he had killed him, and shot him in the eye, that he would not have him come in and swing his revolver over a sick woman. He surrendered himself to the officers of the law and was soon afterwards taken into custody. Dr. Wireback testified as to the position and examination of the dead man as follows:

" 'Soon after the killing I was called to see the body. I found the body lying in the corner of the dining room, with the right shoulder leaning against the partition between the dining room and the sitting room; the left shoulder on the floor; the body lying on the left hip, that is, not completely on the side, but about nearly half way on the side and on the back, with right foot extended, or nearly so, reaching almost, if not quite, to the carpet strip, at the door leading into the small bed room. The left arm was doubled up under him, which caused the throwing up of the shoulder in that way; and the shoulder being thrown up in that way to a certain extent prevented the head from going over as far as it would have gone had there been no support there; the shoulder being thrown up that way supported the head

to a certain extent; the head was thrown back and was supported on that shoulder. The right hand was lying over the right side of the body, and my impression is that it touched the floor; if it did not, it was very near the floor. I am not quite positive as to the hand, whether it touched or did not touch the floor; but the hand was just in that position that you would drop your hand without any voluntary act of either closing or opening, just as your hand would naturally be without putting any of the muscles into play, without volition. The revolver was lying 4 or 5 inches from the hand, the butt or handle towards the hand. There was a wound just below, close to the upper edge of the eye cavity; I noticed powder marks on the left side of his face, and I would judge that the muzzle of the weapon was held about 12 or 14 inches from the face when discharged. The effect of a wound such as Mr. Davis received would be the complete relaxation of all muscular tissue, and it would cause him to immediately drop the revolver. Mr. Davis's death was caused by a pistol shot wound, made in the manner that I have described. After the *medulla oblongata* was struck by that bullet Mr. Davis would have neither volition nor consciousness. When I first saw the body it was yet warm, there was no rigidity or stiffness.'

"About thirty-eight days thereafter, three physicians exhumed the remains, held an autopsy, and brought away with them the skull of the deceased, which was produced and offered in evidence, together with an exhaustive recital of the result of their examination and their opinions thereon, the pistol bullet found in the skull, and testified that the cause of death was the pistol shot wound. Diagrams showing the interior apartments and arrangements of the Dinsmore house, made from actual measurements in the month of February, and claimed to be an accurate representation, and of the surroundings, were explained for the information of the jury. A justice of the peace, acting coroner, impaneled a jury and held an inquest on the dead body during the afternoon of the day of the killing. The personal effects found upon the clothing of the deceased were identified and received in evidence, among which was the revolver, which had dropped from the hands of the deceased and was found near his body; it was a six shooter and had in its six loads. Another revolver, a five shooter, alleged to be the prisoner's, when delivered

to the coroner's jury contained four shells loaded and one shell unloaded.

"Several witnesses testified to statements made at different times and places shortly before and after the shooting in question, by the prisoner, as to his condition of mind, feeling and intention toward the deceased, among which are as follows: 'I have the oldest right there, and I'll be damned if I don't shoot him.' 'If I shot him where I intended to, it would kill him.' "

William Fowles testified:

" 'On the day of the killing I had a conversation with Mr. King in my store, before the killing. I also had a conversation with him after the killing of Davis. At the last conversation King had neither hat, coat, nor vest on. I cannot fix the time exactly, but I think that it was between 2 and 3 o'clock. King comes into the store and says: "Billy, I have killed him." I said: "Killed who?" and he said: "I have killed Davis." I said: "I guess not," and he said: "Yes, I have killed him, and he is lying down there now." I said: "That is a bad job, Dave," and he said: "I had to do it, he (Davis) was kicking the door down and I had to do it to save myself;" and he said "I want to give myself up." I said: "I have no right to arrest you; you will have to go to the authorities and give yourself up." I had a conversation with Mr. King on Friday, at the same place, between 12 and 1 o'clock, or along there. Mr. Samuel Edinger was present and he and I were talking. King came in and he says: "Billy, give me some tobies." I said: "All right;" and when I was giving him the tobies I made the remark: "I suppose you will have to take a walk," and he said: "Not much!" I said: "You will have to talk a walk; Mr. Davis has come to town," and he says: "Not much! I have got something here that will fix Davis!" and he pulled a revolver out of his pocket, but I can't tell you out of what pocket. I was standing behind a cigar case and he held the revolver up in his hand in that shape, up above the case, and he was flourishing it there, and what remark he made I don't know, at the time. It was a self cocker; and I said: "Dave, put that in your pocket; I don't want that flourishing around here; it is a self cocker and a dangerous weapon; put it in your pocket." I saw King on Saturday before the killing, I should think between 1 and 2 o'clock, at the same

place. He comes in and he says: "I met Davis in the drug store and he seems to be very much excited; I think he is after me, but if he is, he is not going to get the drop on me. If he draws a revolver on me I will shoot him dead on the spot." And he was standing and he reached in his overcoat pocket and pulled out a revolver and held it up in his hand, and he says: "I will shoot him with that."

Cross-examination: The first conversation was on Friday.

"Q. That conversation was introduced by you in twitting King with the remark that you guessed he would have to take a walk?

"A. Yes, sir; and he replied that he guessed not. About 1 o'clock of the day of the homicide King came into my store again. He said he had met Davis in the drug store, and he said: 'I think he is after me.'

"Q. Didn't King say to you that he had met Davis in the drug store and he appeared very much excited, and he thought he was after him?

"A. Yes, that is right.

"Q. Is that all he said, that Davis looked excited and he thought he was after him?

"A. Yes, sir; and that he would not get the drop on him. He says: 'If he draws a revolver on me I will shoot him dead.' That is the words he used to me. After the shooting King came into my store and told me that he had shot Davis. He says: 'I have killed him.'

"Q. That he was breaking the door in on me and I had to do it?

"A. Yes, sir. I told him to go to the authorities. He started out and went up the street toward Whitling's.

"Redirect examination: King said Davis was breaking the door in. He did not say 'on him.'

"The facts developed on the trial to maintain the issue on the part of the prisoner were substantially that on the evening of February 3d the prisoner was in attendance at an entertainment in the opera house in St. Petersburg; George Ruffner, a boarder at the house of Mrs. Dinsmore, who had seen the deceased in the Adams House and had been asked by him if King was boarding at Mrs. Dinsmore's, and replied that he was, entered the opera house and informed King that Davis had returned, and of the inquiry concerning him. The defendant then boarded and slept

in the Dinsmore house, and continued to remain there until after the death of the deceased. On the afternoon of February 5, before the commission of the offense charged, the inmates of the house were Mrs. Dinsmore, her daughter, Mrs. Cotton, and the prisoner. What transpired after the arrival of the deceased is explained in the testimony of Mrs. Dinsmore, as follows:

" 'On Saturday afternoon of the 5th of February between 1 and 2 o'clock, Davis came to my house; about fifteen or twenty minutes before that King had come and gone into Ruffner's room and laid down on the bed. Davis rang the bell and came into sitting room and sat down, and after some conversation asked where King was, and said that man King he was going to kill. He had his hand in his overcoat pocket. I asked him what he had against King. He then jumped up off the chair, drew the revolver to the top of his pocket, and said he would blow my brains out. My daughter said: "That is pretty big threats." Davis stepped into the dining room and drew his fist back and said for her to shut up her mouth or he would drop her to the floor. Mr. King called my daughter to his room; afterwards she came out, went out the front room and started out the door; then Mr. Davis made a grab for her and told her to come back or he would blow her brains out. Mrs. Cotton called Davis to her room; I went and he followed me; she asked him not to make any fuss or disturbance on her account and he said he would not; and he then drew the revolver out of his pocket, pulled it over my head, and then jammed it against my temple; I backed out of the bed room and walked backwards till I got to about the middle of the dining room, and he followed after me; I then went to the room where King lay and as I was going there Davis told me not to make any alarm or he would blow my brains out and blow King's out; I opened the door and stepped into the room, and as I stepped into the door King was lying on the bed. He got up off the bed and stepped to the back of the door; I shut the door and turned up the thumb latch; there was something against the door like a kick and a push, and the door gave away. Davis was on the outside of the door and had his revolver in his hand, saw King standing there, drew the revolver at his head and said: "Oh, you !" and Mr. King jumped at the right of me from where he stood and Davis jumped his head down that way, and I heard the report of the

pistol. I then walked out and went up town. Davis remained in the house with my consent; I did not order him out.'

"Mrs. Celesta Cotton, who said she had been doing housework at Mrs. Dinsmore's, testified:

" 'On the afternoon of the 5th of February I was sick in bed at Mrs. Dinsmore's. I called Mr. Davis to my bed room; Mrs. Dinsmore came in and Davis followed her; I asked him if he would not make any fuss for I was sick and I was afraid it would make me worse. He said no, he wouldn't; then he said he had been drinking, but not very much, and again said: "No, Lesta, I won't make any fuss, for your sake;" Mrs. Dinsmore said, "No, Mr. Davis, you ought not to make any fuss, for it might make her worse." Just then Mr. Davis jerked the revolver out of his pocket and whirled it around a couple of times and pointed it at Mrs. Dinsmore's forehead, saying that he would blow her brains out. Mrs. Dinsmore then walked backwards out of the bed room; Davis followed her; I heard them walk through the dining room; I could see about half ways through the dining room; I heard a door open and shut, then heard something like a kick, I thought it was; then heard a door slam back against the wall, then I heard a pistol shot and heard something fall; just in a second I saw Mrs. Dinsmore walk out; King walked out after her in a second or two.'

"It further appears from the testimony that between 1 and 2 o'clock on the Saturday afternoon the deceased was in the Adams House, where he took a drink of whisky, and after stating to Mr. M'Cafferty that he had a good deal of trouble, that King kept his hands in his overcoat pocket on his revolver, but he could shoot as quick as he (King) could, said: 'Mac, don't you think I am straight enough to shoot straight?' asked him not to divulge what he said, and then went out, and in about an hour he was dead.

"J. S. Craig testified: 'King was in my drug store, Davis came in, they were eyeing each other; King had his hands in his pocket and walked out; Davis said: "Did you see the ——— ——?" (using an opprobrious epithet) "He had a pistol in his pocket but I have a d———d sight better one," and he pulled it out and said: "I ought to shoot him and if it had not been for my respect for you I would have shot him." He walked a crack and said: "I am not very drunk." He left the store and went in the direction of the Dinsmore house at fifteen minutes after

2 o'clock in the afternoon; fifteen or twenty minutes after I heard of the tragedy. Davis appeared to be in agony and was very much agitated in his mind.'

"To the witness, Brossman, King said: 'I saw Davis at Craig's drug store; he was very nervous. If Davis ever pulls a revolver on me, I will shoot him. I want you to go down to Craig's drug store and hear if Davis was making threats against me; if he is I will swear my life against him.' There was no evidence of any threat or declaration of Davis having been communicated to King.

"The commonwealth in rebutting called members of the coroner's jury to contradict the testimony of Mrs. Dinsmore and Lilly by showing that what they testified to before the coroner's jury was different from what they stated on this trial, and also other declarations made by Mrs. Dinsmore to Scott Higgins.

"The foregoing compendium of the testimony contains the main facts elicited during the trial. Any material omissions will be supplied by the jury from their recollection of the proof. The issue is clearly defined: The commonwealth alleges that the prisoner at the bar shot and killed the deceased; the prisoner does not deny the commission of the crime but alleges that the act was done in self defense."

The jury returned a verdict of guilty of murder in the first degree; and a motion for a new trial having been denied, sentence and judgment were pronounced, and defendant took this writ, specifying the following assignments of error:

1. The overruling of the objection of defendant's counsel to the admission in evidence of the two small bottles and contents.

2. The overruling of the objection of defendant's counsel to the admission of Dr. I. J. Wirebank's evidence in answer to the hypothetical question "Will you please state, on the supposition that the deceased held in his hand a revolver, pointed at another person, what the effect of that wound would have been upon the hand and the weapon? You have stated what it would be upon the object and life; now please answer that, what in your judgment would have been the result on that hand and a pistol?"

3. The overruling of the objection of defendant's counsel to the admission of evidence in answer to the question: "Then, supposing the circumstances detailed in the previous question to be correct, could that revolver, in your judgment, have been found

in the position in which you discovered it, supposing no interference in the mean time?"

4, 5, 6. The overruling of objections of defendant's counsel to the admission of evidence in answer to certain questions, substantially the same and as follows: "Suppose the deceased, Mr. Davis, to have been standing within 14 or 16 inches of the defendant, King. Davis on the outside of that strip of carpet, King inside of it in the little room, and this pistol in the hands of Davis, extended towards King, under the circumstances, if the *medulla oblongata* had been wounded as you say, do you believe, as a physician and expert, that that pistol would have been found on the floor, within 4 or 6 inches of the right hand of the deceased, and lying parallel with his hand, and the butt towards that hand?"

7, 8. (In relation to the manner of examination of certain witnesses.)

9. The overruling of the objection of defendant's counsel to the following offer made by counsel for the commonwealth, and to the admission in evidence of two letters written by Mrs. Dinsmore to Mr. Davis, the deceased:

Mr. Moore, for commonwealth: I now propose to offer and read the letters that were identified by Mrs. Dinsmore and shown to defendant's counsel this morning—commonwealth's exhibits D and E.

Mr. Weidner, for defendant: For what purpose?

Mr. Moore, for commonwealth: For the purpose, first, of showing the relation of Mr. King and Mrs. Dinsmore, and for the purpose of contradicting Mrs. Dinsmore's statements in relation to that intimacy.

Mr. Reed, for defendant: We object to that as totally irrelevant and incompetent as to contradiction of the relation between Mrs. Dinsmore and Mr. King; it has nothing to do with this case, is not relevant, is incompetent, and could not be given in evidence; and the court has ruled it out, because Mrs. Dinsmore is not on trial; nor would any relationship affect either her credibility as a witness, nor could the defendant's right be prejudiced by any act that she might have done.

By the court: I understood this morning that you agreed to admit both the letters, and that they might be considered in evidence at the time they should be offered. You said you had no

objection to them, and they could go in; the commonwealth's counsel then said they would not offer the letters at that time.

Mr. Weidner, for defendant: If I said that, I object to them now; and I insist on my objection, and a ruling, and, if the court admits them, on an exception.

By the court: The letters are admitted because the defendant's counsel at a prior session agreed they should be considered in evidence. They are, therefore, admitted and the objection is overruled.

10. The court erred in charging the jury as follows:

"Several witnesses testified to statements made at different times and places, shortly before and after the shooting in question, by the prisoner, as to his condition of mind, feeling, and intention towards the deceased, among which are as follows: 'I have the oldest right there and I'll be d——d if I don't shoot him.'

"There is nothing in the testimony containing this expression of King's to show that the same referred to the deceased."

11. Referring to the words above quoted (I have the oldest right there, and I'll be d——d if I don't shoot him) as expressing the intention of the defendant against the deceased, in that there was no testimony to show that the defendant in using said words referred to the deceased.

12. The court erred in charging the jury as follows:

"To the witness, Brossman, King said: 'I saw Davis at Craig's drug store; he was very nervous. If Davis ever pulls a revolver on me, I will shoot him. I want you to go down to Craig's drug store and hear if Davis was making threats against me; if he is I will swear my life against him.' There was no evidence of any threats or declarations of Davis's having been communicated to King."

13. Charging the jury as follows:

"While the statute of this state provides that a person charged with the commission of misdemeanor, or felonies of whatever grade, shall at his own request, but not otherwise, be deemed a competent witness, his neglect, omission, or refusal to testify shall not create any presumption against him; nor shall any reference be made to nor any comment be made upon such neglect, omission, or refusal, by counsel in the case, during the trial of the case. The jury should decide the case with reference alone to the testimony actually introduced before them and with-

out reference to what might or might not have been proved if other persons had testified."

14. Adopting and applying to the facts of this case the facts and principles of law arising thereon, as found and laid down in the charge of Judge Agnew to the petit jury in the case of Com. v. Drum, 58 Pa. 14.

15. Charging the jury as follows:

"On the part of the commonwealth it is alleged that in consequence of previous statements of Davis, his unexpected return from St. Louis to St. Petersburg, King armed himself with a deadly weapon with the intention of using it upon the deceased, if they met; that he knew that Davis was coming to the Dinsmore house on Saturday; that he retired to the room used by the boarder Ruffner; did not go to bed, but waited for an opportunity to carry out his previously formed intention to take life; and as soon as he saw Davis he immediately discharged his revolver. In this view of the case, the preparation of the revolver, the entire absence of provocation at the time of giving the wound, the deadly nature of the weapon and the vital part at which the weapon was aimed, together with the circumstances proved on the trial, all tend to prove that the killing was wilful; that there was time to deliberate; that the shot was premeditated; that there was no legal ground of provocation and no impetuous rage or passion. If you believe this is the true version of the case, then you are asked by the commonwealth to convict the prisoner of murder in the first degree, on the ground that he killed the deceased wilfully, deliberately, and premeditatedly, and with malice aforethought. If you should find this to be so, it would constitute in law murder in the first degree."

16. Charging the jury as follows:

"To excuse homicide on the plea of self defense it must appear that the slayer had no other possible or at least probable means of escaping."

17. Charging the jury as follows:

"When it comes to a question whether one man shall flee or another shall die, the law decides that the former shall rather flee than that the latter shall die."

18. The court also erred (when the jury returned for further instructions after they had been considering and discussing the guilt or innocence of the defendant for about seventeen

hours) in not charging the jury as to the law of self defense, as requested by defendant's counsel.

19. The court erred (when the jury returned into court for further instructions and requested that the portion of the charge including reasonable doubt be again read to them) in reading a portion of the charge which the jury did not request to be read.

*John W. Reed, Harry R. Wilson,* and *W. A. Hindman,* for plaintiff in error.—The first specification of error relates to the admission of irrelevant and immaterial evidence.

It is error to admit evidence, the tendency of which is to lead the minds of the jury into an irrelevant inquiry. Cummings v. Williamsport, 84 Pa. 477.

In criminal cases the courts rarely presume that the particular evidence which was wrongfully admitted could have had no influence on the deliberations of the jury; and there are few exceptions to the general rule that in such cases of misruling the defendant has a right to have his case given to another jury in a legal shape. Wharton, Crim Pl. & Pr. § 802.

The second, third, fourth, fifth, and sixth specifications of error may be considered together, and raise the single question, *viz.:* Is it error to permit a hypothetical question to be put and answered, which requires the witness to guess at the essential and material facts upon which the correctness of his answer depends, and which answer will accordingly sustain the theory of the commonwealth or the theory of the defendant as the witness may favor the one or the other in his guessing?

The seventh specification of error illustrates the character of attack made on every material witness called on the part of the defendant, and its permission by the court below contravened the legal principle that a witness shall not be required to answer questions, when collateral to the issue, put to him on cross-examination for the mere purpose of wounding his feelings and bringing him into disgrace, or to excite the prejudice and inflame the minds of the jury against him. Wharton, Ev. § 472.

The eighth specification of error covers an attempt to attack the credibility of the witness in a way unknown to the law.

The ninth specification of error contains the offer and admission in evidence of the two letters written by Mrs. Dinsmore to the deceased.

These letters were incompetent to affect the defendant; he had nothing whatever to do with writing the letters, nor had he any knowledge of them whatever, either before or after they were written.    Zell v. Com. 94 Pa. 274.

These letters also were irrelevant and should have been excluded.    It was an attempt, and the tendency was, to fasten upon the defendant the commission of a separate and distinct crime from that charged in the indictment, which is not permissible.    Snyder v. Com. 85 Pa. 521.

It was also an attempt, and the tendency was, to affect the credibility and impeach the character of the defendant's most material witness by evidence of particular acts of misconduct; and its admission for that purpose was improper.    Zell v. Com. 94 Pa. 274; Snyder v. Com. 85 Pa. 521.

If counsel had consented that these letters might go in evidence, that consent was withdrawn before they were offered, and their admission objected to; but we take it as settled law in a case of this kind that the defendant could not consent or waive his rights to a legal trial, nor could counsel do so for him. Mills v. Com. 13 Pa. 630; Peiffer v. Com. 15 Pa. 470, 53 Am. Dec. 605; Meyers v. Com. 83 Pa. 141.

The tenth and eleventh specifications of error may be considered together.    The court here assumed the very point at issue.    There was no evidence that the statement here mentioned referred to the deceased; but the court inferred and stated to the jury that it did.

Such assumption of fact by the court is error.    Musselman v. East Brandywine & W. R. Co. 2 W. N. C. 107.

It was a question proper for the consideration of the jury, and its withdrawal from their consideration by the court was error.    Oram v. Rothermel, 98 Pa. 300.

It was a binding instruction what inference the jury was to draw from the facts in evidence.    Wenrich v. Heffner, 38 Pa. 207.

The twelfth specification of error covers the withdrawal, by the court, of a material fact from the consideration of the jury. It was of vital importance for the defendant to show that he had knowledge of the threats made against him by the deceased, and this appeared in the testimony of the witness, Brossman; but the court instructed the jury otherwise, and in quoting this witness's testimony gave that part to the jury which was against

the defendant and excluded from their consideration that part which was for him.

The thirteenth specification of error covers the reference of the court to the neglect, omission, or refusal of the defendant to testify in his own behalf, and the comments made thereon. The act of May 21, 1885, prohibits any reference to or comments upon such neglect, omission, or refusal to testify, by counsel during the trial of the cause; and in the case of Com. v. Brown, 16 W. N. C. 557, Judge GALBRAITH in a very clear and forcible opinion granted the defendant a new trial because the district attorney, during the trial of the cause, inadvertently referred to the fact that the defendant, who was charged with the crime of murder, was a competent witness.

The act of May 23, 1887, which was passed after the trial of this case, provides that such neglect or refusal shall not be adversely referred to by court or counsel during the trial. The word "adversely" does not appear in the act of 1885.

The fourteenth, sixteenth, and seventeenth specifications of error relate to what we consider a just and legal cause of complaint. The charge of Judge AGNEW in the case of Com. v. Drum, in our judgment is a very severe charge; and while it may be admitted that it was proper and applicable in that case, it does not necessarily follow that it was applicable to the case in hand. Drum was attacked in the public street, and the defendant in this case was attacked in his own habitation; and the law as applicable to self defense in the one case is not applicable in the other.

When a person is attacked in his own house he need retreat no further. Here he stands at bay and may turn on and kill his assailant if this be apparently necessary to save his own life; nor is he bound to escape from his own house in order to avoid his assailant; and is not bound to retreat out of his own house to avoid violence, even though a retreat might be safely made. 1 Wharton, Crim. Law, § 502.

A felonious attack on a house or its inmates may be resisted by taking life. Id. § 503.

The protection of the house extends to each and every individual dwelling in it. Id. note 4, § 505; Com. v. Daley, 2 Clark (Pa.) 370.

A house of ill fame affords the inmates, in the eyes of the law,

the same measure of protection as any other dwelling house. People v. Rector, 19 Wend. 591.

The fifteenth specification of error covers that part of the judge's charge purporting to give the commonwealth's version of the case. In this epitome the court assumed material facts or allegations not made by the commonwealth and not justified by the testimony, and which were directly opposed to the facts in evidence.

If the court misleads the jury by directing their attention to a point on which there is no evidence, it is error. Hersheaur v. Hocker, 9 Watts, 455; Snyder v. Wilt, 15 Pa. 59–64.

The admission of allegations, without evidence to support them, if calculated to mislead the jury, is error. Greber v. Kleckner, 2 Pa. St. 289.

If the language of the charge as to the true character of the testimony tends to mislead the jury it is ground of reversal. Fawcett v. Fawcett, 95 Pa. 376.

A charge which misleads differs from a mere omission to instruct. Pennsylvania R. Co. v. Berry, 68 Pa. 279.

Where a state of facts could not be inferred on a demurrer to evidence, it is error to submit it to the jury as possible. Haines v. Stouffer, 10 Pa. 363.

It is error for the court to assume allegations of fact which the testimony does not justify. Egbert v. Payne, 99 Pa. 244; Musselman v. East Brandywine & W. R. Co. 2 W. N. C. 105.

The eighteenth and nineteenth specifications of error may be considered together. Here the court again repeated the objectionable part of his charge referred to in the fifteenth specification of error.

The twentieth and twenty-first specifications of error may be considered together.

It is the duty of a judge trying a man for his life to charge fully upon the law as applicable to the facts. The rule that a judge is not to be convicted of error for what he omits to say will not do. The prisoner has a right to have the jury properly instructed upon every question of law legitimately raised by the evidence. Meyers v. Com. 83 Pa. 141.

The twenty-second and twenty-third specifications of error may be considered together. The defendant was deprived of a trial by an impartial jury surrounded by all the safeguards established by law.

The separation of the jury during the trial of a homicide case gives rise to a presumption of improper influence which the prosecution is bound to remove. Goersen v. Com. 106 Pa. 477, 51 Am. Rep. 534; Moss v. Com. 107 Pa. 270.

When the self-governing power is wanting, whether it is caused by insanity, gross intoxication, or other controlling influence, it cannot be said truthfully that the mind is fully conscious of its own purposes, and deliberates or premeditates in the sense of the act describing murder in the first degree. Jones v. Com. 75 Pa. 406.

There must be a fully formed purpose to kill, with so much time for deliberation and premeditation as to convince that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. Green v. Com. 83 Pa. 77.

This court must be satisfied that the ingredients of murder in the first degree exist in the evidence. Act of February 15, 1870; Grant v. Com. 71 Pa. 505.

*Quære,*—Whether this court will not reverse if not satisfied beyond a reasonable doubt that the defendant had the time and the power to deliberate on his act. Meyers v. Com. 83 Pa. 142.

*Frank R. Hindman,* Dist. Atty., and *W. D. Moore* for the commonwealth, defendant in error.

PER CURIAM:

After listening to the able and learned arguments of the counsel for the plaintiff in error, and examining with close attention the assignments of error in this case, we fail to discover the slightest fault committed in the court below. Not one of the exceptions contains anything that is novel, except, perhaps, the fourteenth. They have all, in one shape or the other, been repeatedly before us, and as repeatedly overruled.

The articles found upon the dead person and the opinions of the experts were properly admitted in evidence. So, also, were King's threats, and Mrs. Dinsmore's letters. Neither is the complaint that the court did not fully and properly instruct the jury on the law of self defense, a just one, for the charge of the learned judge is full and complete on all points, and we do not know how a better one could have been framed.

It is true the quotation from Com. v. Drum, 58 Pa. 14, em-

braced by the fourteenth assignment, might well have been omitted, for it added nothing to what the learned judge said; but as it was made part of the charge, and certainly did the defendant no harm, we may pass it as immaterial.

Nor can we agree that the ingredients necessary to constitute murder in the first degree were wanting in the evidence. Of course, had the jury believed the testimony on part of the defense their conclusion doubtless would have been different from what it was; but the credibility of the witnesses was a matter for them to pass upon, and not for us or the court below. On the other hand, the evidence on part of the commonwealth warranted that body in finding, not only that the killing was wilful and malicious, but also deliberate.

The other exceptions are of no moment whatever; and we, therefore, pass them without comment.

Judgment affirmed, and it is ordered that the record be returned to the court below for execution.